# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO: _____

CITY OF MIAMI, a Florida municipal
Corporation,

      Plaintiff,

v.

CITIGROUP INC.; CITIBANK, N.A.;
CITIMORTGAGE, INC.; CITI
HOLDINGS, INC.; and CITICORP
TRUST BANK, FSB,               DEMAND FOR JURY TRIAL

      Defendants.

_____/

## COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL FAIR HOUSING ACT

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ................................................................................................1

    A.    Citigroup Inc. Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Miami Resulting in Foreclosures ..................................................1

II.   PARTIES .............................................................................................................................8

III.  JURISDICTION AND VENUE ........................................................................................10

IV.   FACTUAL BACKGROUND ............................................................................................10

    A.    Background Regarding Discriminatory Loan Practices, Reverse Redlining, and Redlining ..............................................................................................................10

V.    CITI ENGAGED IN DISCRIMINATORY LENDING PRACTICES ..................................14

    A.    Citi's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act ................................................................................................14

        1.    Discriminatory lending results in a disproportionate number of foreclosures in minority areas. ...............................................................................14

        2.    Minority neighborhoods are disproportionate recipients of predatory loans. .16

    B.    Citi Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act .................................................................................................18

    C.    Minorities in Fact Receive Predatory Loan Terms from Citi ....................................19

    D.    Minorities in Miami Receive Such Predatory Loan Terms from Citi Regardless of Creditworthiness ..............................................................................................21

    E.    Citi's Targeting of Minorities who in Fact Receive Predatory Loan Terms Regardless of Creditworthiness Causes Foreclosures ................................................23

        1.    Data shows that Citi's foreclosures are disproportionately located in minority neighborhoods in Miami. .......................................................................23

        2.    Data shows that Citi's loans to minorities result in especially quick foreclosures. ..........................................................................................26

        3.    Data shows that the discriminatory loan terms cause the foreclosures. ..........27

VI.   INJURY TO MIAMI CAUSED BY CITI'S  DISCRIMINATORY LOAN PRACTICES ........................................................................................................28

    A.    Miami Has Been Injured by a Reduction in Property Tax Revenues from Foreclosures Caused by Discriminatory Loans Issued by Citi ..................................29

1.    The decreased value of the properties foreclosed by Citi result in reduced property tax revenues. ...................................................................................29

2.    The decreased value of properties in the neighborhoods surrounding foreclosed properties results in reduced property tax revenues.....................29

B.   Miami Is Injured Because It Provided and Still Must Provide Costly Municipal Services for Foreclosure Properties in Minority Neighborhoods as a Direct Result of Discriminatory Loans Originated or Purchased by Citi ................................................32

VII.   SAMPLE FORECLOSURE PROPERTIES  IN THE CITY OF MIAMI ............................34

VIII.  STATUTE OF LIMITATIONS AND CONTINUING VIOLATIONS DOCTRINE...................................................................................................................34

IX.   CLAIMS FOR RELIEF....................................................................................................35

FIRST CLAIM FOR RELIEF  (Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*).............................................................................................35

SECOND CLAIM FOR RELIEF (Common Law Claim for Unjust Enrichment Based on Florida Law) ..........................................................................................37

DEMAND FOR JURY TRIAL .....................................................................................38

PRAYER FOR RELIEF .................................................................................................38

# I.   NATURE OF THE ACTION

1.      It is axiomatic that banks should not make discriminatory loans.  Banks must extend credit to minorities on equal terms as they do to other similarly situated borrowers.  Banks should not target minority neighborhoods for loans that discriminate nor make loans to minorities on terms that are worse than those offered to whites with similar credit characteristics.  When banks engage in such discriminatory conduct, the misconduct has profound financial consequences for the cities in which mortgaged properties exist, and banks should be responsible for those financial consequences.  Banks should reimburse the City for lost tax revenues due to discriminatory lending.  And banks should pay the costs of repairing and maintaining properties that go into foreclosure due to discriminatory lending.  This lawsuit arises because Citigroup breached these legally mandated obligations and foreseeably injured the City of Miami.

## A.   Citigroup Inc. Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Miami Resulting in Foreclosures

2.      This suit is brought pursuant to the Fair Housing Act of 1968 ("FHA"), as amended, 42 U.S.C. §§ 3601, *et seq.*, by the City of Miami ("Miami" or "City") to seek redress for injuries caused by Citigroup Inc.'s[1] ("Citi" or "the Bank") pattern or practice of illegal and discriminatory mortgage lending.  Specifically, Miami seeks injunctive relief and damages for the injuries caused by foreclosures on Citi's loans in minority neighborhoods and to minority borrowers that are the result of Citi's unlawful and discriminatory lending practices.  The unlawful conduct alleged herein consists of both intentional discrimination and disparate impact discrimination.

---

[1] Defendants collectively are referred to as "Citi," including:  CitiGroup Inc., CitiBank, N.A., CitiMortgage, Inc., CitiCorp Trust Bank, FSB. Citi Holdings, Inc. Plaintiff alleges that Defendants are also liable for residential home loans and lending operations acquired from, and/or sold by or through, ABN Amro Mortgage Group, Inc., Ameriquest Mortgage Company, Argent Mortgage Company, Argent Mortgage Company LLC, and Olympus Mortgage Company.

3.     The State of Florida in general, and the City of Miami in particular have been devastated by the foreclosure crisis.  As of October 2013, the State of Florida has the country's highest foreclosure rate, and Miami has the highest foreclosure rate among the 20 largest metropolitan statistical areas in the country.[2]  Moreover, Florida is by far the leading state in the country with regard to owner-vacated or "Zombie" foreclosures.[3]

4.     The foreclosure crisis in Florida resulted in such drastic consequences that the Florida Supreme Court established a Task Force to recommend "policies, procedures, strategies, and methods for easing the backlog of pending residential mortgage foreclosure cases while protecting the rights of parties."[4]

5.     Citi has engaged in a continuous pattern and practice of mortgage discrimination in Miami since at least 2004 by imposing different terms or conditions on a discriminatory and legally prohibited basis.  In order to maximize profits at the expense of the City of Miami and minority borrowers, Citi adapted its unlawful discrimination to changing market conditions.  This unlawful pattern and practice is continuing through the present and has not terminated.  Therefore, the operative statute of limitations governing actions brought pursuant to the Federal Fair Housing Act has not commenced to run.

---

[2] RealtyTrac, *Scheduled Judicial Foreclosure Auctions Increase Annually for 16th Straight Month, Foreclosure  Starts Up Monthly for Second Straight Month, Big Jumps in FL, IL, CO*, (Nov. 14, 2013) (*available at* http://www.realtytrac.com/content/foreclosure-market-report/october-2013-us-foreclosure-market-report-7934).

[3] RealtyTrac, *Q1 2013 Foreclosure Inventory Update*, pg. 5 (*available at* http://www.realtytrac.com/images/reportimages/RealtyTrac_Foreclosure_Inventory_Analysis_Q1_2013.pdf).

[4] Florida Supreme Court Task Force On Residential Mortgage Foreclosure Cases, *Final Report And Recommendations* (August 17, 2009) (*available at* www.floridasupremecourt.org/.../Filed_08-17-2009_Foreclosure_Final_).

6.      The pattern and practice of lending discrimination engaged in by Citi consists of traditional redlining[5] and reverse redlining,[6] both of which have been deemed to violate the FHA by federal courts throughout the country.  Citi engaged in redlining, and continues to engage in said conduct, by refusing to extend mortgage credit to minority borrowers in Miami on equal terms as offered to non-minority borrowers.  Citi engaged in reverse redlining, and continues to engage in said conduct, by extending mortgage credit on predatory terms to minority borrowers in minority neighborhoods in Miami on the basis of the race or ethnicity of its residents. Federal Reserve Chairman Ben Bernanke recently acknowledged these twin evils of mortgage discrimination, and explained that both types of mortgage discrimination "continue to have particular significance to mortgage markets."[7]

7.      Major banks such as Citi have a long history of engaging in redlining throughout Miami.  That practice began to change in the late 1990s, when Citi adapted to changing market conditions, and began to flood historically underserved minority communities with mortgage loans that consisted of a variety of high cost and abusive mortgage loan products with predatory terms as compared to the mortgage loans issued to white borrowers (reverse redlining).

8.      Citi's discriminatory lending practices have the purpose and effect of placing vulnerable, underserved borrowers in loans they cannot afford.  Reverse redlining maximizes Citi's profit without regard to the borrower's best interest, the borrower's ability to repay, or the financial health of underserved minority neighborhoods.  Moreover, Citi has averted any significant risk to itself by selling

---

[5] Redlining is the practice of denying credit to particular neighborhoods based on race.

[6] Reverse redlining is the practice of flooding a minority community with exploitative loan products.

[7] Remarks by Federal Reserve Chairman Ben Bernanke at the Operation HOPE Global Financial Dignity Summit, Atlanta, Georgia at pg. 10 (November 15, 2012) (*available at* www.federalreserve.gov/newsevents/speech/bernanke20121115a.htm).

the vast majority of mortgage loans it originates or purchases on the secondary market (collectively "Citi Loans").

9.      Between 1996-2006, one category of discriminatory loan products – subprime loans – grew throughout the country from $97 billion to $640 billion.  These loans were frequently targeted to minorities.  Upon information and belief, the lack of accessible credit resulting from Citi's previous pattern and practice of redlining in the minority communities in Miami created conditions whereby the Bank could easily target and exploit the underserved minority communities who, due to traditional redlining, had been denied credit.

10.      Thereafter, following several years of issuing abusive, subprime mortgage loans throughout the minority communities of Miami, commencing in or around 2007, Citi once again adapted to changing market conditions, while continuing its pattern and practice of issuing a variety of discriminatory loan products.  Simultaneously, Miami and other communities throughout the country experienced a curtailment of mortgage credit issued to minority borrowers.[8]   Citi is one of the largest mortgage lenders doing business in Miami and its policies and practices contributed to this problem.  In other words, Citi not only refused to extend credit to minority borrowers when compared to white borrowers, but when the Bank did extend credit, it did so on predatory terms.  This combination of reverse redlining and redlining represents a continuing and unbroken pattern and practice of mortgage lending discrimination in Miami that still exists today.

11.      Citi's pattern and practice of *reverse redlining* has caused an excessive and disproportionately high number of foreclosures on the Citi Loans it has made in the minority neighborhoods of Miami.  Foreclosures on loans originated by Citi are

---

[8] Center for Responsible Lending, *The State of Lending in America & its Impact on U.S. Households* (2012) (*available at* http://www.responsiblelending.org/state-of-lending/State-of-Lending-report-1.pdf); Harvard School of Public Health, *Home Purchase Loan Denial Rate By Race/Ethnicity* (2010) (*available at* http://diversitydata.sph.harvard.edu/Data/Rankings/Show.aspx?ind=9).

concentrated in these neighborhoods.   *A loan in a predominantly minority neighborhood is 4.516 times more likely to result in foreclosure than is a loan in a neighborhood with a majority of white residents.*

12.     Citi's pattern and practice of *traditional redlining* has also caused an excessive and disproportionately high number of foreclosures in the minority neighborhoods of Miami.  These foreclosures often occur when a minority borrower who previously received a predatory loan sought to refinance the loan, only to discover that Citi refused to extend credit at all, or on terms equal or similar to those in refinance loans offered to white borrowers.  The inevitable result of the combination of issuing a predatory loan, and then refusing to refinance the loan, was foreclosure.

13.     Citi would have had comparable foreclosure rates in minority and white communities if it had properly and uniformly applied responsible underwriting practices in both areas.  Citi possesses sophisticated underwriting technology and data that allows it to predict with precision the likelihood of delinquency, default, or foreclosure.  The fact that Citi's foreclosures are so disproportionately concentrated in minority neighborhoods is not the product of random events.  To the contrary, it reflects and is fully consistent with Citi's practice of targeting minority neighborhoods and customers for discriminatory practices and predatory pricing and products.  It also reflects and is consistent with Citi's practice of failing to underwrite minority borrowers' applications properly, and of putting these borrowers into loans which (1) have more onerous terms than loans given to similarly situated white borrowers, and (2) the borrowers cannot afford, leading to foreclosures.

14.     The Bank's discriminatory lending practices are evidenced when Miami data on Citi loans is examined.  Such an examination reveals a widespread practice of discrimination.  For example, a regression analysis that controls for credit history and other factors demonstrates that an African-American Citi borrower is 5.955

times more likely to receive a predatory loan than is a white borrower, and a Latino borrower is 3.463 times more likely to receive such a loan. The regression analysis confirms that African-Americans with FICO scores over 660 are 15.086 times more likely to receive a predatory Citi loan than is a white borrower, and a Latino borrower is 5.282 times more likely to receive such a loan.

15. A variety of governmental and private actions have been asserted against Citi relating to predatory lending practices. In 2000, Citi acquired Associates First Capital Corporation, which was widely criticized for predatory lending practices. Citi eventually settled with the Federal Trade Commission by agreeing to pay $240 million to customers who had been victims of predatory practices. In 2007, Citi indicated that its exposure to subprime mortgages was less than $13 billion, when in fact it was over $50 billion; the Securities and Exchange Commission said that Citi had made misleading statements about the company's exposure. In 2010, Citi agreed to pay $75 million to settle civil charges that it misled investors over potential losses from high-risk mortgages. In 2012, Citi agreed to pay $158 million to settle claims that it falsely certified the quality of loans issued by its CitiMortgage unit over a period of more than six years, so that they would qualify for insurance from the Federal Housing Administration.

16. During the financial crisis of 2008, Citi suffered huge losses and was rescued in a massive stimulus package by the U.S. government. In 2009, Citi announced that the United States government would take a large equity stake in the company by converting emergency aid into common shares with a U.S. Treasury credit line to prevent bankruptcy. In 2010, Citi repaid the government aid and repurchased its shares from the U.S. government. In fact, Citi amassed a huge cash flow in the wake of the financial crisis. The Bank's discriminatory practices and resulting foreclosures in the City's minority neighborhoods have inflicted significant, direct, and continuing financial harm to the City.

17.     In this action the City seeks damages based on reduced property tax revenues based on (a) the decreased value of the vacant properties themselves, and (b) the decreased value of properties surrounding the vacant properties.  In addition, the City seeks damages based on the expenditure of municipal services that were provided and will be required to remedy the blight and unsafe and dangerous conditions which exist at properties that were foreclosed as a result of Citi's illegal lending practices.

18.     Because of the multitude of analytic tools available to Citi to determine the likelihood that a particular mortgage loan would result in default by the borrower, as well as the existence of various studies, reports, and other pertinent literature specifically addressing the connection between mortgage loans and foreclosures, it was foreseeable that Citi knew, or should have known, that a predatory or high risk loan issued to an African-American or Hispanic in certain neighborhoods in Miami would result in default and subsequent foreclosure. Moreover, because Citi maintains numerous branch offices throughout Miami, and has knowledge of the specific address for each loan it issued, it was foreseeable that Citi knew, or should have known, of the condition of foreclosed properties corresponding to loans that it issued in Miami regardless of whether it serviced the loan or subsequently sold the servicing rights to a third party.

19.     According to Federal Reserve Chairman Bernanke, "foreclosures can inflict economic damage beyond the personal suffering and dislocation that accompany them.  Foreclosed properties that sit vacant for months (or years) often deteriorate from neglect, adversely affecting not only the value of the individual property but the values of nearby homes as well.  Concentrations of foreclosures have been shown to do serious damage to neighborhoods and communities, reducing tax bases and leading to increased vandalism and crime.  Thus, the overall effect of

the foreclosure wave, especially when concentrated in lower-income and minority areas, is broader than its effects on individual homeowners."[9]

20.    The discriminatory lending practices at issue herein have resulted in what many leading commentators describe as the "greatest loss of wealth for people of color in modern US history."  It is well-established that poverty and unemployment rates for minorities exceed those of whites, and therefore, home equity represents a disproportionately high percentage of the overall wealth for minorities.[10]  As Federal Reserve Chairman Bernanke recently explained, as a result of the housing crisis, "most or all of the hard-won gains in homeownership made by low-income and minority communities in the past 15 years or so have been reversed."[11]  The resulting impact of these practices represents "nothing short of the preeminent civil rights issue of our time, erasing, as it has, a generation of hard fought wealth accumulation among African Americans."[12]

## II.    PARTIES

21.    Plaintiff City of Miami is a Florida municipal corporation.  The City is authorized by the City Commission to institute suit to recover damages suffered by the City as described herein.

22.    Citigroup Inc. is a multinational financial services corporation and bank holding company.  Upon information and belief, its corporate headquarters are located in New York, New York.  Citigroup was formed from one of the world's largest mergers in history by combining the banking giant Citicorp and financial conglomerate Travelers Group in October 1998.  It is currently one of the largest

---

[9] Bernanke, *supra* n.7 at pg. 4.

[10] Robert Schwemm and Jeffrey Taren, *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act,* 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV., 375, 382 (2010).

[11] Bernanke, *supra* n.7 at pg. 3.

[12] Charles Nier III and Maureen St. Cyr, *A Racial Financial Crisis: Rethinking the Theory of Reverse Redlining to Combat Predatory Lending Under the Fair Housing Act*, 83 TEMPLE LAW REV. 941, 942 (2011).

banks in the United States.  Citi's major brand names include Citibank, CitiFinancial, Primerica, Citi Smith Barney, Banamex and Nikko.  Citi owns and controls Citibank, N.A.

23.     Upon information and belief, Citibank's corporate headquarters are located in Sioux Falls, South Dakota.  Citibank is organized as a national banking association under the laws of the United States.  Citibank owns CitiMortgage, Inc.

24.     Upon information and belief, CitiMortgage is based in O'Fallon, Missouri.  CitiMortgage is an operating subsidiary of Citibank.  CitiMortgage maintains offices in the State of Florida and specifically in the City of Miami for the purposes of soliciting applications for and making residential mortgage loans and engaging in other business activities, including specifically with the City of Miami.

25.     The CitiFinancial Mortgage division of Citi offered exclusively non-prime loans.  These loans were offered to both consumer direct and wholesale clients.

26.     In 2009, Citi announced that it would realign into two businesses, Citicorp and Citi Holdings.  The latter, Citi Holdings, included CitiMortgage.  Regarding Citi's strategy for these businesses going forward, Citi explained "management will focus on tightly managing risks and losses, and maximizing the value of these assets."  And, "with the new Citi Holdings, we will be able to tighten our focus on risk management…."

27.     The Defendants in this action are, or were at all relevant times, subject to Federal laws governing fair lending, including the FHA and the regulations promulgated under each of those laws.  The FHA prohibits financial institutions from discriminating on the basis of, inter alia, race, color, or national origin in their residential real estate-related lending transactions.

28.     The Defendants in this action are or were businesses that engage in residential real estate-related transactions in the City of Miami within the meaning of the FHA, 42 U.S.C. § 3605.

29.     Based on information reported pursuant to the Home Mortgage Disclosure Act, in addition to loans that Defendants originated directly, Defendants are responsible for residential home loans acquired from, and/or sold by or through, ABN Amro Mortgage Group, Inc., Argent Mortgage Co., Ameriquest Mortgage Co., and Town & Country Credit Corp.

30.     Upon information and belief, Plaintiff alleges that each of the Defendants was and is an agent of the other Defendants.  Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies, and/or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal.  Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting through its agents, and is liable on the basis of the acts and omissions of its agents.

### III.    JURISDICTION AND VENUE

31.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331, 1343, because the claims alleged herein arise under the laws of the United States.

32.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Citi conducts business in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district.

### IV.    FACTUAL BACKGROUND

**A.    Background Regarding Discriminatory Loan Practices, Reverse Redlining, and Redlining**

33.     Prior to the emergence of subprime lending, most mortgage lenders made only "prime" loans.  Prime lending offered uniformly priced loans to

borrowers with good credit, but individuals with lower credit were not eligible for prime loans.

34.     Subprime lending developed and began growing rapidly in the mid-1990s as a result of technological innovations in risk-based pricing and in response to the demand for credit by borrowers who were denied prime credit by traditional lenders.  Advances in automated underwriting allowed lenders to predict with improved accuracy the likelihood that a borrower with lower credit will successfully repay a loan.  These innovations gave lenders the ability to adjust the price of loans to match the different risks presented by borrowers whose credit records did not meet prime standards.  Lenders found that they could now accurately price loans to reflect the risks presented by a particular borrower.  When done responsibly, this made credit available much more broadly than had been the case with prime lending.

35.     Responsible subprime lending has opened the door to homeownership to many people, especially low- to moderate-income and minority consumers, who otherwise would have been denied mortgages.  At the same time, however, subprime lending has created opportunities for unscrupulous lenders to target minorities and engage in discriminatory, irresponsible lending practices that result in loans that borrowers cannot afford.  This, in turn, leads directly to defaults and foreclosures.

36.     Enticed by the prospect of profits resulting from exorbitant origination fees, points, and related pricing schemes, some irresponsible subprime lenders took advantage of a rapidly rising real estate market to convince borrowers to enter into discriminatory loans that had unfair terms that they could not afford.  Often this was accomplished with the help of deceptive practices and promises to refinance at a later date.  These abusive subprime lenders did not worry about the consequences of default or foreclosure to their business because, once made, a significant number of the loans were sold on the secondary market.

37.     As the subprime market grew, the opportunities for abusive practices grew with it.[13]  As a consequence, the federal government has found that abusive and predatory practices "are concentrated in the subprime mortgage market."[14]  These practices, which in recent years have become the target of prosecutors, legislators, and regulators, include the following:

a.     Placing borrowers in subprime loans even though they qualify for prime or conventional loans on better terms.

b.     Failing to prudently underwrite hybrid adjustable rate mortgages (ARMs), such as 2/28s and 3/27s.[15]  After the borrower pays a low "teaser rate" for the first two or three years, the interest rate on these loans resets to a much higher rate that can continue to rise based on market conditions.  Subprime lenders often underwrite these loans based only on consideration of whether the borrower can make payments during the initial teaser rate period, without regard to the sharply higher payments that will be required for the remainder of a loan's 30-year term.  Irresponsible lenders aggressively market the low monthly payment that the borrower will pay during the teaser rate period, misleading borrowers into believing that they can afford that same low monthly payment for the entire 30-year term of the loan, or that they can refinance their loan before the teaser rate period expires.

---

[13] United States Department of Housing and Urban Development Office of Policy Development and Research, Report to Congress on the Root Causes of the Foreclosure Crisis, (2010) at 52 ("While many factors have undoubtedly contributed to the recent rise in foreclosures, as discussed earlier, no small part of the increase stems from recent increases in abusive forms of subprime lending") (*available at* http://www.huduser.org/portal/Publications/PDF/Foreclosure_09.pdf).

[14]  United States Department of Housing & Urban Development and United States Department of the Treasury, Curbing Predatory Home Mortgage Lending (2000) at 1 (*available at* http://www.huduser.org/Publications/pdf/treasrpt.pdf) ("HUD/Treasury Report").

[15] In a 2/28 ARM, the "2" represents the number of years the mortgage will be fixed over the term of the loan, while the "28" represents the number of years the interest rate paid on the mortgage will be variable.  Similarly, in a 3/27 ARM, the interest rate is fixed for three years and variable for the remaining 27-year amortization.

c.      Failing to prudently underwrite refinance loans, where borrowers substitute unaffordable mortgage loans for existing mortgages that they are well-suited for and that allow them to build equity.  Such refinanced loans strip much or even all of that equity by charging substantial new fees, often hiding the fact that the high settlement costs of the new loan are also being financed.  Lenders that aggressively market the ability of the borrower to pay off existing credit card and other debts by refinancing all of their debt into one mortgage loan mislead borrowers into believing that there is a benefit to debt consolidation, while obscuring the predictable fact that the borrower will not be able to repay the new loan.  The refinanced loans are themselves often refinanced repeatedly with ever-increasing fees and higher interest rates, and with ever-decreasing equity, as borrowers seek to stave off foreclosure.

d.      Allowing mortgage brokers to charge "yield spread premiums" for qualifying a borrower for an interest rate that is higher than the rate the borrower qualifies for and can actually afford.

e.      Failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, reserves, and work history.  These criteria ensure that a borrower is obtaining a loan that he or she has the resources and assets to repay, and ignoring these criteria results in many loans that bear no relation to borrowers' ability to repay them.  This allows the lender to make a quick profit from the origination, but sets the borrower up for default and foreclosure.

f.      Requiring substantial prepayment penalties that prevent borrowers whose credit has improved from refinancing their subprime loan to a prime loan.  Prepayment penalties not only preclude borrowers from refinancing to a more affordable loan, but reduce the borrowers' equity when a subprime lender convinces borrowers to needlessly refinance one subprime loan with another.

g.      Charging excessive points and fees that are not associated with any increased benefits for the borrower.

38.    The problem of predatory practices in subprime mortgage lending is particularly acute in minority communities because of "reverse redlining."  As used by Congress and the courts, the term "reverse redlining" refers to the practice of targeting residents in certain geographic areas for credit on unfair terms due to the racial or ethnic composition of the area.  This is in contrast to "redlining," which is the practice of denying *prime* credit to specific geographic areas because of the racial or ethnic composition of the area.  Both practices have repeatedly been held to violate the Federal Fair Housing Act.

39.    Following the onset of the subprime mortgage crisis, and after years of issuing abusive home loans in minority neighborhoods, the big bank lenders began to limit the issuance of mortgage credit to minority borrowers (*i.e.*, refusing to refinance predatory loans).  At the same time, when the big banks did extend credit, they continued to do so on predatory terms.

## V.    CITI ENGAGED IN DISCRIMINATORY LENDING PRACTICES

### A.    Citi's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act

#### 1.    Discriminatory lending results in a disproportionate number of foreclosures in minority areas.

40.    Foreclosures are on the rise in many of the nation's most vulnerable neighborhoods, particularly those with substantial concentrations of minority households.  The increase appears to stem from the presence of (1) subprime lending in these communities and (2) continuing discriminatory lending practices (*e.g.*, steering minorities into loan products with more onerous terms – which happen to be more profitable for Citibank).

41.    A seminal report on foreclosure activity by Mark Duda and William Apgar documents the negative impact that rising foreclosures have on low-income

and low-wealth minority communities, using Chicago as a case study.  Mr. Apgar is a Senior Scholar at the Joint Center for Housing Studies of Harvard University, and a Lecturer on Public Policy at Harvard's John F. Kennedy School of Government.  He previously served as the Assistant Secretary for Housing/Federal Housing Commissioner at the U.S. Department of Housing and Urban Development, and also Chaired the Federal Housing Finance Board.  Mr. Apgar holds a Ph.D. in Economics from Harvard University.  Mr. Duda is a Research Fellow at the Joint Center for Housing Studies.  The Apgar-Duda report has continually been cited by subsequent governmental, public sector, and private sector reports due to its clarity and thoroughness with respect to the negative impact foreclosures have on lower-income and minority neighborhoods.[16]

42.     This significant report highlights the foreseeability of foreclosures arising from predatory lending practices and their attendant harm, demonstrating that such foreclosures impose significant and predictable costs on borrowers, municipal governments, and neighboring homeowners.

43.     Another report, by the Center for Responsible Lending, uses a national dataset to show that the foreclosure rate for low- and moderate-income African-Americans is approximately 1.8 times higher than it is for low- and moderate-income non-Hispanic whites.  The gap is smaller for Latinos, especially among low-income households, but even among low-income Latinos the foreclosure rate is 1.2 times that of low-income whites.  Racial and ethnic disparities in foreclosure rates cannot be explained by income, since disparities persist even among higher-income groups.  For example:  approximately 10 percent of higher-income African-American borrowers and 15 percent of higher-income Latino borrowers have lost their homes to foreclosure, compared with 4.6 percent of higher income non-Hispanic white

---

[16] *See* W. Apgar, M. Duda & R. Gorey, *The Municipal Costs of Foreclosures:  A Chicago Case Study* (2005) (*available at* http://www.nw.org/network/neighborworksProgs/foreclosuresolutions/documents/2005Apgar-DudaStudy- FullVersion.pdf).

borrowers.  Overall, low- and moderate-income African-Americans and middle- and higher-income Latinos have experienced the highest foreclosure rates.[17]

44.     Nearly 20 percent of loans in high-minority neighborhoods have been foreclosed upon or are seriously delinquent, with significant implications for the long-term economic viability of these communities.[18]

### 2.     Minority neighborhoods are disproportionate recipients of predatory loans.

45.     There is a substantial body of empirical evidence demonstrating the prevalence of reverse redlining in the subprime mortgage market.  These studies show that, even after controlling for creditworthiness and other legitimate underwriting factors, subprime loans and the predatory practices often associated with subprime lending are disproportionately targeted at minority neighborhoods.[19]

46.     In general, as recently observed by the Federal Reserve in December 2012, both African-American and Hispanic borrowers were far more likely (in fact, nearly twice as likely) to obtain higher-priced loans than were white borrowers. These relationships hold both for home-purchase and refinance lending and for non-

---

[17] Center for Responsible Lending, *Lost Ground, 2011:  Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* http:/www.responsiblelending.org/-mortgage-lending/research-analysis/*Lost-Ground-2011*.pdf).

[18] *Id.*

[19] *See* Abt Associates, *Using Credit Scores to Analyze High-Cost Lending in Central City Neighborhoods* (2008); Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/mortgage-lending/research-analysis/*Lost-Ground--2011*.pdf ); Center for Responsible Lending, *Unfair Lending:  The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (2006) (*available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-Unfair_Lending-0506.pdf); Finance and Economics Discussion Series Divisions of Research & Statistics and Monetary Affairs Federal Reserve Board, Washington, D.C, *Subprime Mortgages: What, Where, and to Whom?* (2008) (*available at* http://www.nber.org/papers/w14083.pdf?new_window=1 ); C. Reid and E. Laderman, Federal Reserve Bank of San Francisco, *The Untold Costs of Subprime Lending: Examining the Links among Higher-Priced Lending, Foreclosures and Race in California*, Presented at Brandeis University (2009) (*available at* http://iasp.brandeis.edu/pdfs/Author/reid-carolin/The%20Untold%20Costs%20of%20Subprime%20Lending%203.pdf).

conventional loans.  These differences are reduced, but not eliminated, after controlling for lender and borrower characteristics.  "Over the years, analyses of HMDA data have consistently found substantial differences in the incidence of higher-priced lending across racial and ethnic lines, differences that cannot be fully explained by factors included in the HMDA data."[20]

47.     African-Americans and Hispanics were much more likely to receive subprime loans and loans with features that are associated with higher foreclosures, specifically prepayment penalties and hybrid or option ARMs.  These disparities were evident even comparing borrowers within the same credit score ranges.  In fact, the disparities were especially pronounced for borrowers with higher credit scores.  For example, among borrowers with a FICO score of over 660 (indicating good credit), African-Americans and Latinos received a high interest rate loan more than three times as often as white borrowers.[21]

48.     In addition to receiving a higher proportion of higher-rate loans, African-Americans and Latinos also were much more likely to receive loans with other risky features, such as hybrid and option ARMs and prepayment penalties.  Disparities in the incidence of these features are evident across all segments of the credit spectrum.

49.     Since 2008, as the data discussed below makes clear, there has been a shift in the types of loans issued – and not issued – by the Bank.  For example, the Bank shifted from offering new subprime loans toward issuing more Home Equity Lines of Credit (HELOCs) and higher cost FHA/VA loans.[22]  FHA and VA

---

[20] Federal Reserve Bulletin, *The Mortgage Market in 2011: Highlights from the Data Reported under the Home Mortgage Disclosure Act* (Dec. 2012) (*available at* http://www.federalreserve.gov/pubs/bulletin/2012/PDF/2011_HMDA.pdf).

[21] Center for Responsible Lending, *Lost Ground, 2011, supra* n.17.

[22] While FHA/VA loans are not inherently predatory, these loans have higher risk features such as higher fees and higher interest rates.  When banks target minorities for FHA/VA loans and issue more of them to minorities, they are acting in a discriminatory manner.

government loans are characterized as higher risk loans because (1) they are typically more expensive for a borrower than conventional loans and include fees and costs not associated with conventional loans, and (2) several of the government loan programs permit negative amortization.[23]  At the same time, in the last several years, the Bank tightened lending requirements in a manner that drastically limited the ability of minority borrowers to refinance or otherwise modify the subprime loans previously issued by the Bank.

50.    At the same time that conventional credit has contracted over the past five years, FHA lending has expanded dramatically.  During the subprime boom, FHA lending fell as subprime lenders targeted minority communities.  Now, with little or no subprime lending, and conventional credit restricted, FHA lending has shot up.  Overall, the share of loans with government backing went from 5% in 2005 to 26.6% in 2010.[24]

51.    For African-Americans, the share of mortgages used to purchase a home and backed by a government program increased to almost 80% in 2010; for Latinos the share increased to 73%.  But for whites, the share increased to only 49%.  At present, most minority borrowers cannot gain access to the conventional mortgage market and, instead, are relegated to more expensive FHA loans.[25]

**B.    Citi Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act**

52.    The statistical analysis set forth throughout this Complaint provides circumstantial evidence that between 2004-2012 Citibank engaged in a pattern and practice of intentional discrimination resulting in foreclosures in the City of Miami.

---

[23]   California Reinvestment Coalition, et al., *Paying More for the American Dream VI, Racial Disparities in FHA/VA Lending,* (July 2012); www.fha.com/fha_loan_types; www.benefits.va.gov/homeloans].

[24] Center for Responsible Lending, *supra*, n.8.

[25] *Id*.

**C.      Minorities in Fact Receive Predatory Loan Terms from Citi**

53.      As discussed herein, Citi's *predatory* loans include:  high-cost loans (*i.e.*, loans with an interest rate that was at least three percentage points above a federally-established benchmark), subprime loans, interest-only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no documentation loans, and/or ARM loans with teaser rates (*i.e.*, lifetime maximum rate > initial rate + 6%).

54.      Data reported by the Bank and available through public databases shows that in 2004-2012, 54.6% of loans made by Citi to African-American and Latino customers in Miami were high cost, but only 31.1% of loans made to white customers in Miami were high cost.  This data demonstrates a pattern of statistically significant[26] differences in the product placement for high-cost loans between minority and white borrowers.[27]

55.      The following map of Citi predatory loans originated in Miami between 2004-2012 illustrates the geographic distribution of predatory loans in African-American and Latino neighborhoods and white neighborhoods in Miami.  This map demonstrates that Citi's predatory loans are disproportionately located in minority neighborhoods.

---

[26] Statistical significance is a measure of probability that an observed outcome would not have occurred by chance. As used in this Complaint, an outcome is statistically significant if the probability that it could have occurred by chance is less than 10%.

[27] As alleged throughout the complaint, all references to the date range 2004-2012 are intended to include the time period up to and including December 31, 2012.



### D.   Minorities in Miami Receive Such Predatory Loan Terms from Citi Regardless of Creditworthiness

56.    According to *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act*, 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV. 375, 398 (2010), several studies dating back to 2000 have established that minority borrowers were charged higher interest rates/fees than similar creditworthy white borrowers.

57.    Likewise, according to *A Racial Financial Crisis*, 83 TEMPLE LAW REV. 941, 947, 949 (2011), one study concluded that "even after controlling for underwriting variables, African-American borrowers were 6.1% to 34.3% more likely than whites to receive a higher rate subprime mortgage during the subprime boom." And another study found that significant loan pricing disparity exists among low-risk borrowers – African-American borrowers were 65% more likely to receive a subprime home purchase loan than similar creditworthy white borrowers, and 124% more likely to receive a subprime refinance loan.

58.    Similarly, the Center for Responsible Lending's November 2011 report, *Lost Ground, 2011:  Disparities in Mortgage Lending and Foreclosures,* stated that "racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes." Further, the Center stated it is "particularly troublesome" that minorities received riskier loans "even within [similar] credit ranges." For example, among borrowers having FICO scores above 660, the incidence of higher rate loans among various groups was as follows:  whites – 6.2%; African-American – 21.4%; and Latino – 19.3%.

59.    Moreover, data reported by the Bank and available through both public and private databases shows that minorities in Miami received predatory loan terms from Citi more frequently than white borrowers, regardless of creditworthiness.

60.    A regression analysis of this data controlling for borrower race and objective risk characteristics such as credit history, loan-to-value ratio, and the ratio

of loan amount to income demonstrates that, from 2004-2012, an African-American borrower was 5.955 times more likely to receive a predatory loan than was a white borrower possessing similar underwriting and borrower characteristics.  The regression analysis further demonstrates that the odds that a Latino borrower would receive a predatory loan were 3.463 times the odds that a white borrower possessing similar underwriting and borrower characteristics would receive a predatory loan. These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

61.    The regression analysis also shows that these disparities persist when comparing only borrowers with FICO scores above 660.  An African-American borrower with a FICO score above 660 was 15.086 times more likely to receive a predatory loan as was a white borrower with similar underwriting and borrower characteristics.  A Latino borrower with a FICO score above 660 was 5.282 times more likely to receive a predatory loan as was a white borrower with similar underwriting and borrower characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

62.    A similar regression analysis taking into account the racial makeup of the borrower's neighborhood rather than the individual borrower's race shows that borrowers in heavily minority neighborhoods in Miami were more likely to receive predatory loans than were borrowers in heavily white neighborhoods.  For example, a borrower in a heavily minority census tract (census tract consisting of at least 90% African-American or Latino households) was 5.738 times more likely to receive a predatory loan as was a borrower with similar characteristics in a non-minority neighborhood (census tract with at least 50% white households).  These odds ratios

demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

63.     This data also establishes that Citi disproportionately issued  loans with higher risk features including government loans (FHA/VA) and other high cost loans to African-American and Latino borrowers in Miami from 2008-2012.  A regression analysis, controlling for borrower race and objective risk characteristics such as ratio of loan amount to income, demonstrates that an African-American borrower was 9.777 times more likely to receive one of these loans with higher risk features than was a white borrower possessing similar borrower and underwriting characteristics. The regression analysis further demonstrates that a Latino borrower was 1.890 times more likely to receive one of these loans with higher risk features than was a white borrower possessing similar borrower and underwriting characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

64.     Thus, the disparities are not the result of, or otherwise explained by, legitimate non-racial underwriting criteria.

**E.     Citi's Targeting of Minorities who in Fact Receive Predatory Loan Terms Regardless of Creditworthiness Causes Foreclosures**

**1.     Data shows that Citi's foreclosures are disproportionately located in minority neighborhoods in Miami.**

65.     Citi has intentionally targeted discriminatory lending practices at African-American and Latino neighborhoods and residents.  Far from being a responsible provider of much-needed credit in minority communities, Citi is a leading cause of stagnation and decline in African-American and Latino neighborhoods where its foreclosures are concentrated.  Specifically, since at least 2000, its foreclosures have been concentrated in neighborhoods with African-American or Latino populations exceeding 75%.

66.    Although 88.7% of Citi's loan originations in Miami from 2004 to 2012 occurred in census tracts that are at least 50% African-American or Latino, 95.9% of Citi's loan originations that had entered foreclosure by June 2013 were in those census tracts.  Moreover, while 11.3% of Citi's loan originations in Miami from 2004 to 2012 occurred in census tracts that were less than 50% African-American or Latino, only 4.1% of Citi's loan originations that had entered foreclosure by June 2013 were in those census tracts.  This data demonstrates a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

67.    The following map represents the concentration of Citi's loan originations from 2004 through 2012 that had entered foreclosure by June 2013 in African-American and Latino neighborhoods.  In addition to the disproportionate distribution of Citi foreclosures in African-American and Latino neighborhoods, disparate rates of foreclosure based on race further demonstrate Citi's failure to follow responsible underwriting practices in minority neighborhoods.  While 31.9% of Citi's loans in predominantly (greater than 90%) African-American or Latino neighborhoods result in foreclosure, the same is true for only 9.4% of its loans in non-minority (at least 50%) white neighborhoods.  In other words, a Citi loan in a predominantly African-American or Latino neighborhood is 4.516 times more likely to result in foreclosure as is a Citi loan in a non-minority neighborhood.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.



68.     Thus, Citi's discretionary lending policies, and pattern or practice of targeting of minorities, who in fact receive predatory loan terms regardless of creditworthiness, have caused and continue to cause foreclosures in Miami.

**2.     Data shows that Citi's loans to minorities result in especially quick foreclosures.**

69.     A comparison of the time from origination to foreclosure of Citi's loans originated in Miami from 2004 to 2012 shows a marked disparity with respect to the speed with which loans to Latinos and whites move into foreclosure.  The average time to foreclosure for Latino borrowers is 2.733 years.  By comparison, the average time to foreclosure for white borrowers is 2.991 years.  These statistically significant disparities demonstrate that Citi aggressively moved minority borrowers into foreclosure as compared with how the Bank handled foreclosures for white borrowers.

70.     This disparity in time to foreclosure is further evidence that Citi is engaged in lending practices consistent with reverse redlining.  The disparity in time to foreclosure demonstrates that Citi is engaged in irresponsible underwriting in African-American and Latino communities that does not serve the best interests of borrowers.  If Citi were applying the same underwriting practices in African-American and Latino neighborhoods and white neighborhoods in Miami, there would not be a significant difference in time to foreclosure.  Were Citi underwriting borrowers in both communities with equal care and attention to proper underwriting practices, borrowers in African-American and Latino communities would not find themselves in financial straits significantly sooner during the lives of their loans than do borrowers in white communities.  The faster time to foreclosure in African-American and Latino neighborhoods is consistent with underwriting practices in minority communities that are less concerned with determining a borrower's ability to pay and qualifications for the loan than they are in maximizing short-term profit.

71.    The HUD/Treasury Report confirms that time to foreclosure is an important indicator of predatory practices:  "[t]he speed with which the subprime loans in these communities have gone to foreclosure suggests that some lenders may be making mortgage loans to borrowers who did not have the ability to repay those loans at the time of origination."[28]

### 3.    Data shows that the discriminatory loan terms cause the foreclosures.

72.    Citi's discriminatory lending practices cause foreclosures and vacancies in minority communities in Miami.

73.    Steering borrowers into loans that are less advantageous than loans for which they qualify, including steering borrowers who qualify for prime loans into subprime loans, can cause foreclosures because the borrowers are required to make higher loan payments.  The difference between what a borrower who is steered in this manner must pay and the lower amount for which the borrower qualified can cause the borrower to be unable to make payments on the mortgage.  In such instances, the borrower would have continued to make payments on the mortgage and remained in possession of the premises had Citi made the loan without improperly steering the borrower into a subprime, or less advantageous loan. Steering borrowers in this manner, therefore, causes foreclosures and vacancies.

74.    Giving a loan to an applicant who does not qualify for the loan, especially a refinance or home equity loan, can also cause foreclosures and vacancies.  Some homeowners live in properties that the borrower owns subject to no mortgage.  Other homeowners live in properties with modest mortgages that they can comfortably afford to pay.  Where a lender, such as Citi, solicits such a homeowner to take out a home equity loan on his or her property or, alternatively, to refinance the existing loan into a larger loan without proper underwriting to assure that the borrower can make the monthly payments for the new, larger loan, the result is likely

---

[28] HUD/Treasury Report at 25.

to be that the homeowner will be unable to make payments on the mortgage.  This is particularly true where the borrower is refinanced from a fixed-rate loan into an adjustable rate loan that the lender knows the borrower cannot afford, should interest rates rise.  In some instances the lender may refinance the borrower into a new loan that the lender knows the borrower cannot sustain, given the borrower's present debt obligations and financial resources.  In such circumstances, the likely result of such practices is to cause homeowners who are otherwise occupying properties without a mortgage, or comfortably making payments on a modest existing mortgage, to be unable to make payments on a new, unaffordable loan.  This, in turn, causes foreclosures and vacancies.  If these unaffordable refinance and home equity loans had not been made, the subject properties would not have become vacant.

75.     A regression analysis of loans issued by Citi in Miami from 2004-2012, controlling for objective risk characteristics such as credit history, loan-to-value ratio, and the ratio of loan amount to income, demonstrates that a predatory loan is 6.526 times more likely to result in foreclosure than is a non-predatory loan.

76.     The regression analysis also demonstrates that a predatory loan made to an African-American borrower was 6.751 times more likely to result in foreclosure as was a non-predatory loan made to a white borrower with similar borrower and underwriting characteristics.  A predatory loan made to a Latino borrower was 9.314 times more likely to result in foreclosure as was a non-predatory loan made to a white borrower with similar risk characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

## VI.    INJURY TO MIAMI CAUSED BY CITI'S DISCRIMINATORY LOAN PRACTICES

77.     Miami has suffered financial injuries as a direct result of Citi's pattern or practice of reverse redlining and the resulting disproportionately high rate of foreclosure on Citi loans to African-Americans and Latinos in minority

neighborhoods in Miami.  Miami seeks redress for these injuries.  The City does not seek redress in this action for injuries resulting from foreclosures on mortgages originated by lenders other than Citi.

78.     Citi continues to engage in the discriminatory pattern or practice described herein with similar and continuing deleterious consequences to the City.

79.     The City seeks damages based on reduced property tax revenues based on (a) the decreased value of the vacant properties themselves, and (b) the decreased value of properties surrounding the vacant properties.  In addition, the City seeks damages based on municipal services that it provided and still must provide to remedy blight and unsafe and dangerous conditions which exist at properties that were foreclosed as a result of Citi's illegal lending practices.

**A.   Miami Has Been Injured by a Reduction in Property Tax Revenues from Foreclosures Caused by Discriminatory Loans Issued by Citi**

**1.   The decreased value of the properties foreclosed by Citi result in reduced property tax revenues.**

80.     Homes in foreclosure tend to experience a substantial decline in value (e.g., 28%).[29]

81.     A portion of the total lost home value in Miami is attributable to homes foreclosed as a result of Citi's discriminatory loan practices.  The decreased property values of foreclosed homes in turn reduce property tax revenues to the City and constitute damages suffered by Miami.

**2.   The decreased value of properties in the neighborhoods surrounding foreclosed properties results in reduced property tax revenues.**

82.     Citi foreclosure properties and the problems associated with them likewise cause especially significant declines in surrounding property values because

---

[29] Campbell, John Y., Stefano Giglio, and Parag Pathak, National Bureau of Economic Research, NBER Working Paper Series, "*Forced Sales and House Prices*" (2009) (*available at* http://www.nber.org/papers/w14866.pdf?new_window=1).

the neighborhoods become less desirable.  This in turn reduces the property tax revenues collected by Miami.

83.    Property tax losses suffered by Miami as a result of vacancies resulting from Citi's foreclosures are fully capable of empirical quantification.

84.    Routinely maintained property tax and other data allow for the precise calculation of the property tax revenues lost by the City as a direct result of particular Citi foreclosures.  Using a well-established statistical regression technique that focuses on effects on neighboring properties, the City can isolate the lost property value attributable to Citi foreclosures and vacancies from losses attributable to other causes, such as neighborhood conditions.  This technique, known as Hedonic regression, when applied to housing markets, isolates the factors that contribute to the value of a property by studying thousands of housing transactions.  Those factors include the size of a home, the number of bedrooms and bathrooms, whether the neighborhood is safe, whether neighboring properties are well-maintained, and more.  Hedonic analysis determines the contribution of each of these house and neighborhood characteristics to the value of a home.

85.    The number of foreclosures in a neighborhood is one of the neighborhood traits that Hedonic analysis can examine.  Hedonic analysis allows for the calculation of the impact on a property's value of the first foreclosure in close proximity (*e.g.*, ⅛ or ¼ of a mile), the average impact of subsequent foreclosures, and the impact of the last foreclosure.

86.    Foreclosures attributable to Citi in minority neighborhoods in Miami can be analyzed through Hedonic regression to calculate the resulting loss in the property values of nearby homes.  This loss can be distinguished from any loss attributable to non-Citi foreclosures or other causes.  The loss in property value in minority neighborhoods in Miami attributable to Citi's unlawful acts and consequent

foreclosures can be used to calculate the City's corresponding loss in property tax revenues.

87.     Various studies establish that Hedonic regression can be used for this purpose.  A study published by the Fannie Mae Foundation, using Chicago as an example, determined that each foreclosure is responsible for an average decline of approximately 1.1% in the value of each single-family home within an eighth of a mile.[30]

88.     Other studies have focused on the impact of abandoned homes on surrounding property values.  A study in Philadelphia, for example, found that each home within 150 feet of an abandoned home declined in value by an average of $7,627; homes within 150 to 299 feet declined in value by $6,810; and homes within 300 to 449 feet declined in value by $3,542.[31]

89.     These studies highlight the foreseeability of tax-related harm to the City as the result of foreclosures arising from discriminatory loans.

90.     And most recently, a study in Los Angeles reported, "[i]t is conservatively estimated that each foreclosed property will cause the value of neighboring homes within an eighth of a mile to drop 0.9%."  Thus, "[i]n Los Angeles, impacted homeowners could experience property devaluation of $53 billion."[32]  This decreased property value of neighboring homes in turn reduces property tax revenues to the City.

91.     Application of such Hedonic regression methodology to data regularly maintained by Miami can be used to quantify precisely the property tax injury to the

---

[30] *See* Dan Immergluck & Geoff Smith, *The External Costs of Foreclosure: The Impact of Single-Family Mortgage Foreclosures on Property Values*, 17 HOUSING POLICY DEBATE 57 (2006) at 69.

[31] *See* Anne B. Shlay & Gordon Whitman, *Research for Democracy: Linking Community Organizing and Research to Leverage Blight Policy*, at 21 (2004).

[32] The Alliance of Californians for Community Empowerment and the California Reinvestment Coalition, *The Wall Street Wrecking Ball: What Foreclosures are Costing Los Angeles Neighborhoods,* at 3 (2011) ("Cost to Los Angeles Report").

City caused by Citi's discriminatory lending practices and resulting foreclosures in minority neighborhoods.

**B.    Miami Is Injured Because It Provided and Still Must Provide Costly Municipal Services for Foreclosure Properties in Minority Neighborhoods as a Direct Result of Discriminatory Loans Originated or Purchased by Citi**

92.    Citi foreclosure properties cause direct costs to the City because the City is required to provide increased municipal services at these properties. These services would not have been necessary if the properties had not been foreclosed upon.

93.    For example, the City's Police Department has sent, and will continue to send personnel and police vehicles to Citi foreclosure properties to respond to a variety of problems, including increased vagrancy, criminal activity, and threats to public health and safety that arise at these properties because of their foreclosure status. Because violent crime has generally been found to increase due to foreclosures,   the Miami PD must respond to calls reporting suspicious activity at foreclosure properties and perform ongoing investigations involving criminal activity, including gang activity, at these properties.

94.    Likewise, the Miami Fire Department has sent, and will continue to send personnel and resources to Citi foreclosure properties to respond to a variety of fire-related problems that arise at these properties because of their foreclosure status.

95.    The Miami Building Department and Code Enforcement/Code Compliance Departments have devoted, and will continue to devote personnel time and out-of-pocket funds to perform a number of tasks that arise at these properties because of their foreclosure status. These include, but are not limited to the following: (a) inspect and issue permitting violations in contravention of Florida statutes 553 and the Florida Building Code; (b) inspect and issue violations of the Miami City Code and Florida statutes 162; (c) condemn and demolish vacant structures deemed an imminent hazard to public safety.

96.     The City frequently hires independent contractors to perform certain services, including, but not limited to, (i) removing excess vegetation at vacant properties, (ii) hauling away trash and debris at vacant properties, (iii) boarding vacant property from casual entry, (iv) putting up fencing to secure vacant properties, (v) painting and removing graffiti at vacant properties.  Occasionally, some of these services are performed by the City's General Services Administration Department.

97.     The Miami City Attorney's Office has devoted, and will continue to devote personnel time and out-of-pocket resources perform a number of tasks that arise at these properties because of their foreclosure status.  These include, but are not limited to the following: (a) prosecuting code enforcement cases; (b) preserving the City's lien rights at judicial foreclosure proceedings; and (c) pursuing court ordered injunctions involving a myriad of potential problems at foreclosure properties.

98.     The City is required to administer and fund the Unsafe Structures Board, which was formerly under the jurisdiction of Miami-Dade County.

99.     As described in the *Cost to Los Angeles* Report, "[l]ocal government agencies have to spend money and staff time on blighted foreclosed properties, providing maintenance, inspections, trash removal, increased public safety calls, and other code enforcement services …. Responding to these needs is a gargantuan task that involves multiple agencies and multiple levels of local government."[33]

100.    Moreover, as discussed above, the Apgar-Duda report underscores the foreseeability of municipal costs as the result of foreclosures arising from discriminatory loans.

---

[33] *Id*.

## VII.   SAMPLE FORECLOSURE PROPERTIES
## IN THE CITY OF MIAMI

101.   Plaintiff has preliminarily identified one thousand three hundred and ninety-one (1,391) discriminatory loans issued by Citi in Miami between 2004-2012 that resulted in foreclosure.[34]   The City has already incurred, or will incur in the future, damages corresponding to each of these properties.  A sample of property addresses corresponding to these foreclosures is set forth below:

> 3600 NW 5th St., 33125
>
> 70 NW 48th St., 33127
>
> 3430 SW 25th Ter., 33133
>
> 2801 SW 25th St., 33133
>
> 1849 NW 46th St., 33142
>
> 2435 NW 32nd St., 33142
>
> 321 NW 59th Ter., 33127
>
> 4501 NW 3rd Ave., 33127
>
> 564 NW 45th St., 33127
>
> 915 NW 58th St., 33127

## VIII.  STATUTE OF LIMITATIONS AND CONTINUING
## VIOLATIONS DOCTRINE

102.   As alleged herein, Defendant Citi has engaged in a continuous pattern and practice of mortgage discrimination in Miami since at least 2002 by imposing different terms or conditions on a discriminatory and legally prohibited basis.  In order to maximize profits at the expense of the City of Miami and minority borrowers, Citi adapted its unlawful discrimination to changing market conditions.

---

[34] Plaintiff anticipates that it will be able to identify more foreclosures resulting from the issuance of discriminatory loans during this time period with the benefit of discovery.  This conclusion derives from the fact that, because of certain reporting limitations, the publicly-available mortgage loan databases utilized by Plaintiff are not as comprehensive as the mortgage loan databases maintained by, and in the possession of, an issuing bank.

This unlawful pattern and practice conduct is continuing through the present and has not terminated.  Therefore, the operative statute of limitations governing actions brought pursuant to the Federal Fair Housing Act has not commenced to run.

## IX.   CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF
### (Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*)

103.   Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

104.   Citi's acts, policies, and practices as described herein constitute intentional discrimination on the basis of race.  Citi has intentionally targeted residents of predominantly African-American and Latino neighborhoods in Miami for different treatment than residents of predominantly white neighborhoods in Miami with respect to mortgage lending.  Citi has intentionally targeted residents of these neighborhoods for high-cost loans without regard to their credit qualifications and without regard to whether they qualify for more advantageous loans, including prime loans.  Citi has intentionally targeted residents of these neighborhoods for increased interest rates, points, and fees, and for other disadvantageous loan terms, including, but not limited to, adjustable rates, prepayment penalties, and balloon payments.  Citi has intentionally targeted residents of these neighborhoods for unfair and deceptive lending practices in connection with marketing and underwriting mortgage loans.

105.   Citi's acts, policies, and practices have had an adverse and disproportionate impact on African-Americans and Latinos and residents of predominantly African-American and Latino neighborhoods in Miami as compared to similarly situated whites and residents of predominantly white neighborhoods in Miami.  This adverse and disproportionate impact is the direct result of Citi's policies of providing discretion to loan officers and others responsible for mortgage

lending; failing to monitor this discretion to ensure that borrowers were being placed in loan products on a nondiscriminatory basis when Citi had notice of widespread product placement disparities based on race and national origin; giving loan officers and others responsible for mortgage lending large financial incentives to issue loans to African-Americans and Latinos that are costlier than better loans for which they qualify; otherwise encouraging and directing loan officers and others responsible for mortgage lending to steer borrowers into high-cost loans or loans with adjustable rates, prepayment penalties, or balloon payments without regard for whether they qualify for better loans, including but not limited to prime loans; and setting interest rate caps.  These policies have caused African-Americans and Latinos and residents of predominantly African-American and Latino neighborhoods in Miami to receive mortgage loans from Citi that have materially less favorable terms than mortgage loans given by Citi to similarly situated whites and residents of predominantly white neighborhoods in Miami, and that are materially more likely to result in foreclosure.

106.   Citi's residential lending-related acts, policies, and practices constitute reverse redlining and violate the Fair Housing Act as:

(a)   Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of 42 U.S.C. § 3605(a); and

(b)   Discrimination on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling, in violation of 42 U.S.C. § 3604(b).

107.   Citi's policies or practices are not justified by business necessity or legitimate business interests.

108.   Citi's policies and practices are continuing.

109.   The City is an aggrieved person as defined by 42 U.S.C. § 3602(i) and has suffered damages as a result of Citi's conduct.

110.   The City's damages include lost tax revenues and the need to provide increased municipal services.  The loss of tax revenues at specific foreclosure sites and at closely neighboring properties in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to Citi's discriminatory lending.  Likewise, the need to provide increased municipal services at blighted foreclosure sites in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to Citi's discriminatory lending.

111.   Citi's policies and practices, as described herein, had the purpose and effect of discriminating on the basis of race or national origin.  These policies and practices were intentional, willful, or implemented with reckless disregard for the rights of African-American and Latino borrowers.

## SECOND CLAIM FOR RELIEF

### (Common Law Claim For Unjust Enrichment Based On Florida Law)

112.   Plaintiff repeats and incorporates by reference paragraphs 1 - 102 as if fully set forth herein.

113.   Defendants have received and utilized benefits derived from a variety of municipal services, including police and fire protection, as well as zoning ordinances, tax laws, and other laws and services that have enabled Defendants to operate and profit within the City of Miami.

114.   Defendants are aware of and have taken advantage of the services and laws provided by the City of Miami to further their businesses.

115.   As a direct and proximate result of Defendants' predatory lending practices, Defendants have been enriched at the City's expense by utilizing benefits conferred by the City and, rather than engaging in lawful lending practices, practicing unlawful lending practices that have both denied the City revenues it had

properly expected through property and other tax payments and by costing the City additional monies for services it would not have had to provide in the neighborhoods affected by foreclosures due to predatory lending, absent the Defendants' unlawful activities. Defendants have failed to remit those wrongfully obtained benefits or reimburse the City for its costs improperly caused by Defendants, and retention of the benefits by Defendants would be unjust without payment.

116.   In addition, to its detriment the City has paid for the Defendants' externalities, or Defendants' costs of harm caused by its mortgage lending discrimination, in circumstances where Defendants are and have been aware of this obvious benefit and retention of such benefit would be unjust.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), the City demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the City respectfully prays that the Court grant it the following relief:

A.   Enter a declaratory judgment that the foregoing acts, policies, and practices of Citi violate 42 U.S.C. §§ 3604 and 3605;

B.   Enter a permanent injunction enjoining Citi and its directors, officers, agents, and employees from continuing the discriminatory conduct described herein, and directing Citi and its directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the discriminatory conduct described herein, and to prevent additional instances of such conduct or similar conduct from occurring in the future, pursuant to 42 U.S.C. § 3613(c)(1);

C.     Award compensatory damages to the City in an amount to be determined by the jury that would fully compensate the City of Miami for its injuries caused by the conduct of Citi alleged herein, pursuant to 42 U.S.C. § 3613(c)(1);

D.     Award punitive damages to the City in an amount to be determined by the jury that would punish Citi for the willful, wanton, and reckless conduct alleged herein, and that would effectively deter similar conduct in the future, pursuant to 42 U.S.C. § 3613(c)(1);

E.     Award the City its reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 3613(c)(2);

F.     Require payment of pre-judgment interest on monetary damages; and

G.     Order such other relief as this Court deems just and equitable.

Dated: December 13, 2013             Respectfully submitted,

By: s/ Lance A. Harke, P.A.
Lance A. Harke, P.A.
Florida Bar No. 863599
HARKE CLASBY & BUSHMAN LLP
9699 N.E. Second Avenue
Miami, FL 33138
Telephone: 305-536-8220
lharke@harkeclasby.com

Victoria Méndez
Florida Bar No. 194931
CITY OF MIAMI
OFFICE OF THE CITY ATTORNEY
444 S.W. 2nd Avenue, Suite 945
Miami, FL 33130
Telephone: 305-416-1800
vmendez@miamigov.com

Steve W. Berman (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Elaine T. Byszewski (*pro hac vice* forthcoming)
Lee M. Gordon (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA  91101
Telephone:  (213) 330-7150
elaine@hbsslaw.com
lee@hbsslaw.com

Erwin Chemerinsky (*pro hac vice* forthcoming)
UNIVERSITY OF CALIFORNIA, IRVINE
401 East Peltason Drive, Educ. 1095
Irvine, CA  92697
Telephone:  (949) 824-7722
echemerinsky@law.uci.edu

Joel Liberson (*pro hac vice* forthcoming)
Howard Liberson (*pro hac vice* forthcoming)
TRIAL & APPELLATE RESOURCES, P.C.
400 Continental Blvd., 6th Floor
El Segundo, CA  90245
Telephone:  (310) 426-2361
joel@taresources.com
howard@taresources.com

Robert Peck (*pro hac vice* forthcoming)
CENTER FOR CONSTITUTIONAL LITIGATION
777 6th Street NW, Suite 520
Washington, DC  20001
Telephone:  (202) 944-2803
Robert.peck@cclfirm.com


*Attorneys for Plaintiff the City of Miami*